**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Orlando Sanchez; and Frank Salman,<br><br>Plaintiffs,<br><br>v.<br><br>City of Phoenix, a municipal corporation of the State of Arizona; John Does I-X; Jane Does I-X; Black and White Corporations I-X; and ABC Partnerships I-X,<br><br>Defendants. | No. CV-12-1454-PHX-GMS<br><br>**AMENDED ORDER<br>NUNC PRO TUNC** |

Pending before the Court are Plaintiffs' Motion for a Preliminary Injunction (Doc. 2) and Defendant City of Phoenix's Motion to Dismiss (Doc. 18). Because the Court finds that Plaintiffs' case is not ripe, the Motion to Dismiss is granted and the Motion for Preliminary Injunction is denied.

## BACKGROUND

Plaintiff Orlando Sanchez began holding private Bible study classes and worship in his home in 2004. Plaintiff Frank Salman has engaged in a similar practice since 2003. (Doc. 1 ¶¶ 2-3.) Attendance at these sessions averages around 30 people. (*Id.* ¶¶ 27, 47.) These gatherings are not public, and typically friends and family are the attendees. (*Id.* ¶¶ 30, 34, 46, 50.) Neither Sanchez nor Salman have ever received any citations for traffic or noise, and no complaints have been filed against them. (*Id.* ¶¶ 29, 31, 49, 51.) They conduct these sessions out of a belief that conducting religious studies in the home comports with the traditions of the early Christian church and that these activities are a

way of recognizing God's authority in the home. (*Id.* ¶¶ 34, 54.)

Salman's brother, Pastor Michael Salman, also conducted religious activities on his property. (*Id.* ¶¶4-5, 55.) In early 2007, Pastor Salman exchanged several letters with the City regarding his desire to build a separate structure on his property from which he could conduct regular worship services. (Jan. 11, 2013 Evid. Hr'g., Ex. 13.) The City maintained that Pastor Salman's intended use of the property would require a change in occupancy. (*Id.*, Exs. 13-15.) The City cited, among other things, Pastor Salman's use of the facility for Bible study activities. The city asserted that "Bible study use requires a change of occupancy." (*Id.*, Ex. 14.) It elaborated that "[p]laces of worship are classified as an A-3 occupancy under Section 303 of the International Business Code." (*Id.*) Pastor Salman nevertheless proceeded to build the structure, dedicate it as a church, and hold regular gatherings.

Pastor Salman was charged in June 2010 for violations of the City's building code. (Doc. 1 ¶ 5.) The charges arose out of his conducting religious services out of a separate building without complying with the relevant code provisions for houses of worship (*Id.*) He was sentenced in June 2011 to 60 days in jail, three years of probation, $12,000 in fines, and was not permitted to have gatherings of more than 12 people at his residence without making the substantial renovations necessary to bring it into compliance with the building code. (*Id.*; *id.*, Ex. C.) The City cited Pastor Salman in late May 2012 for having more than 12 people at his residence in violation of his probation. (Doc. 1 ¶ 9; *id.*, Ex. D.)

Salman followed his brother's case with great attention. (Doc. 1 ¶ 56.) He and Sanchez were in attendance at a meeting with the city prosecutor, John Tutleman, and asked the prosecutor if the meetings they were holding in their home complied with the City's code. (Doc. 1 ¶¶ 57-58.) Tutleman informed Salman and Sanchez that "only immediate family can come." (*Id.*¶ 58.) When pressed for clarification, Tutleman instead stated that "the issue would be the actual purpose of the meetings and such use is not permitted." (*Id.*) Tutleman claimed that holding Bible studies and other religious gatherings at a residence changed the classification to a place of worship and brought

more stringent building requirements. (*Id.* ¶ 59.)

Plaintiffs brought suit pro se against the City on July 5, 2012. (Doc. 1.) They brought a preenforcement challenge to bar the City's application of the building code against them under the First and Fourteenth Amendments of the U.S. Constitution, the Religious Land Use and Institutionalized Person Act (RLUIPA), 42 U.S.C. § 2000cc, and the Arizona Freedom of Religious Exercise Act (FREA), Ariz. Rev. Stat. § 41-1493. Plaintiffs claim that the City's policy and practice is to apply the code's requirements[1] to residences where people engage in private religious gatherings, but not to residences where other private social gatherings occur. The City allegedly determines that only residences where these religious gatherings take place have had a change of occupancy from a residence to a place of assembly and therefore must conform to the code's extensive requirements.[2] Plaintiffs filed for a preliminary injunction on July 5, but were granted extra time for supplemental briefing on September 18, 2012, when they acquired

---

[1] Section 101.2 of the Phoenix Building Code defines the scope of its provisions in the following manner:

> The provisions of this Code shall apply to the construction, alteration, movement, enlargement, replacement, repair, equipment, use and occupancy, location, maintenance, removal and demolition of every building or structure or any appurtenances connected or attached to such buildings or structures. Detached one- and two-family dwellings and multiple single-family dwellings (town houses) not more than three stories above grade plane in height with a separate means of egress and their accessory structures shall comply with the *International Residential Code*. Existing buildings undergoing repair, alterations or additions and change of occupancy shall be permitted to comply with the *International Existing Building Code*.

[2] The Complaint names § 303 of the Phoenix Building Code as the challenged provision. (Doc. 1 ¶ 1.) Section 303 describes the requirements for a building whose occupancy is determined to be an "Assembly." That category of occupancy "includes, among others, the use of a building or structure, or a portion thereof, for the gathering of persons for purposes such as civic, social or religious functions; recreation, food or drink consumption; or awaiting transportation." § 303.1. The entire purpose of § 303 is to delineate the various occupancy classifications for assemblies. Nothing in the text could be construed to violate the Constitution. Nevertheless, the Complaint was filed by pro se litigants, and the memoranda filed by Plaintiffs' newly-acquired counsel indicates that Plaintiffs are really challenging the alleged policy and practice of the City in denoting use of a residence for private Bible study as a "change in occupancy" from residential to assembly.

counsel. (Docs. 14, 16-17.) The City moved to dismiss the Complaint on September 25, 2012. (Doc. 18.) The Court held an evidentiary hearing on January 11, 2013.

### DISCUSSION

The City's Motion to Dismiss presents a threshold question of jurisdiction that is necessary to resolve before evaluating the merits of Plaintiffs' Complaint or their Motion for a Preliminary Injunction. Because the Court determines that the case is not ripe, it must dismiss the case and deny Plaintiffs' Motion.

**I.   LEGAL STANDARD**

The defense of lack of subject matter jurisdiction may be raised at any time by the parties or the Court. *See* Fed. R. Civ. P. 12(h)(3); *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). Because the City is contesting Plaintiffs' allegation that Pastor Salman was charged for engaging in conduct similar to that in which Plaintiffs seek to engage, the Court construes the jurisdictional challenge to be factual, not facial. In resolving a "speaking motion" or "factual attack" under Rule 12(b)(1), the Court is not limited to the allegations in the pleadings if the "jurisdictional issue is separable from the merits of [the] case." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Instead, the court may view evidence outside the record, and no presumptive truthfulness is due to the complaint's allegations that bear on the subject matter jurisdiction of the court. *See Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983); *Roberts*, 812 F.2d at 1177. Because the "jurisdictional issue is separable from the merits of [the] case," *Roberts*, 812 F.2d at 1177 (9th Cir. 1987), the Court heard "evidence regarding jurisdiction and [is free] to rule on that issue prior to trial, resolving factual disputes where necessary." *Augustine*, 704 F.2d at 1077.

**II.  ANALYSIS**

The City claims that subject matter jurisdiction is lacking because Plaintiffs have not asserted a ripe case or controversy. Article III of the U.S. Constitution limits the jurisdiction of federal courts to "cases" and "controversies." The Court does not sit to decide abstract legal questions in the absence of a real dispute between the parties. In the

- 4 -

parlance of the courts, the case must be "ripe." [3]

Ripeness is "'a question of timing' [which is] designed to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) (citation omitted), *cert. denied*, 531 U.S. 1143 (2001). When a plaintiff challenges a policy, practice, or statute, she "must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)); *see Sacks v. Office of Foreign Asset Control*, 466 F.3d 764, 773 (9th Cir. 2006) (fear of prosecution must be "fairly certain" to provide Article III jurisdiction for pre-enforcement challenge). The law does not require plaintiffs to subject themselves to arrest and subsequent deprivations of liberty in order to create a case or controversy; rather, conditions must be present that create a "credible threat of prosecution" under the challenged enactment. *Id.* But those "having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Younger v. Harris*, 401 U.S. 37, 42 (1971); *Babbitt*, 442 U.S. at 298-99 (a "credible threat of prosecution" is not present where plaintiffs "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible").

The Court looks through a somewhat generous lens when asking this question in a First Amendment context. *See Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) *cert. denied*, 131 S. Ct. 2456 (2011) ("First Amendment cases raise unique standing considerations that tilt[ ] dramatically toward a finding of standing.") Nevertheless, a genuine threat of prosecution must still be present. Three factors guide the determination of whether an alleged threat is sufficiently "genuine" to establish a ripe case or

---

[3] The cases sometimes analyze this situation under the rubric of standing, sometimes under the doctrine of ripeness. The result is the same either way. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) (citation omitted), *cert. denied*, 531 U.S. 1143 (2001).

- 5 -

controversy, but only the first is relevant here: "whether pre-enforcement plaintiffs have failed to show a reasonable likelihood that the government will enforce the challenged law against them." *Id.* at 786; *cf. Thomas*, 220 F.3d at 1139 (asking "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute").

The easiest way for a plaintiff to establish a reasonable likelihood of enforcement of the law against her is to show that the "the prosecuting authorities have communicated a specific warning or threat to initiate proceedings." *Thomas*, 220 F.3d at 1139. Plaintiffs have not alleged that they have received any letters, calls, or visits from City authorities threatening them with prosecution for holding worship or Bible study classes at their residence in violation of the Phoenix Building Code. Instead, they rely on a statement allegedly made by City prosecutor Tutleman at some point in its investigation of Pastor Salman. Plaintiffs allege that Tutleman, in response to their question about the propriety of holding Bible studies in the home, claimed that doing so changed the classification to a place of assembly, which necessitated compliance with the Code's more stringent building requirements. (*Id.* ¶ 59.) The City strenuously denies that such a conversation took place, but that issue is not pertinent on a motion to dismiss. Even if the prosecutor made that statement, such an opinion is not a direct threat of enforcement against Plaintiffs. *Cf. LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1156 (9th Cir. 2000) (direct threat existed when officials contacted plaintiffs and the employees and threatened to enforce regulation over several years). In *Thomas*, there was not a credible threat of enforcement of a housing regulation when "[n]o prospective tenant has ever complained to the landlords, let alone filed a complaint against them. Neither the . . . State Commission for Human Rights nor the . . . Equal Rights Commission has ever initiated an investigation into the landlords' rental practices or commenced a civil enforcement action or criminal prosecution under the challenged laws." 220 F.3d at 1137. The present situation is

identical. No neighbor has ever lodged a complaint against Plaintiffs' classes and the authorities have never contacted Plaintiffs. Moreover, at the evidentiary hearing, the City expressly denied the existence of any pending investigation against Plaintiffs and any intention of prosecuting individuals for conducting Bible studies at their residence. There has not been any direct threat.

Absent a direct threat, Plaintiffs can still establish a reasonable likelihood of enforcement by showing "a history of past enforcement against parties similarly situated to the plaintiffs." *Lopez*, 630 F.3d at 786-87. The classic case is *Adult Video Association v. Barr*. In *Barr*, distributors of sexually explicit video tapes demonstrated a threat of prosecution by pointing to the government's active enforcement of obscenity laws against other videotape distributors. 960 F.2d 781, 785 (9th Cir. 1991), *vacated sub nom. Reno v. Adult Video Ass'n*, 509 U.S. 917 (1993), *reinstated in relevant part*, 41 F.3d 503, 504 (9th Cir. 1994), *cert. denied*, 514 U.S. 1112 (1995). Thus, where a plaintiff points to the government's action against another, the question becomes whether there is sufficient similarity of positions between the plaintiff and the third party. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1125 (9th Cir. 2009).

Plaintiffs rely heavily on the City's action against Pastor Salman, brother to Plaintiff Salman. The letters sent by the City to Pastor Salman, however, are insufficient to show a history of past enforcement. The letters contain statements like "Bible studies are not allowed to be conducted in your residence" and "using the residence or the chicken coop/bar for Bible study activities . . . is a change of occupancy" and threats like "[f]ailure to cease will subject you to citations and other penalties prescribed by the Phoenix Building Code." (Jan. 11, 2013 Hr'g Exs. 13-15.) In isolation, these statements can read like threats by the City to prosecute Pastor Salman if he continued to hold Bible studies at his residence or barn. The first letter, however, reveals that Pastor Salman was engaged in a more extensive enterprise. The exchange between the City and Pastor Salman appears to concern his efforts to build a structure for his *church*. (*Id.*, Ex. 15.) Even taking the letters at face value, they at most amount to a vague threat of

prosecution. Plaintiffs have not cited, nor has the Court found, any case where a threat of enforcement against one party was sufficient to create a reasonable likelihood of enforcement against the other. Actual enforcement is necessary. *See, e.g.*, *Lopez*, 630 F.3d at 786-87; *Stormans*, 586 F.3d at 1125; *Thomas*, 220 F.3d at 1137.

And the actual enforcement action taken against Pastor Salman had a very different character than conducting Bible studies. The Court held an evidentiary hearing on January 11, 2013, to illuminate the circumstances surrounding the prosecution of Pastor Salman. The documents it received in evidence demonstrate that the enforcement action against Pastor Salman cannot create a reasonable likelihood of enforcement against the Plaintiffs. That prosecution was for a very different set of actions. The thrust of the City's case against Pastor Salman was that he built a separate structure on the property, converted that property into a place of worship, and had regular worship services. (Jan. 11, 2013 Hr'g Exs. 19-21.) In contrast to the alleged desire of the Plaintiffs to have private Bible study and worship in their homes, Pastor Salman ran a full-fledged church, complete with a chapel, pulpit, signs, religious iconography, and brochures. (*Id.*, Exs. 17-21.) The cumulative effect of Pastor Salman's extensive operation was that the City determined there was a change in occupancy from a residence to a place of assembly. (*Id.*, Ex. 12-16.) Pastor Salman, however, refused to make the changes to his property to bring it into compliance with the code requirements for places of assembly. The City then charged him with more than sixty building code violations.

The testimony from Pastor Salman's trial likewise establishes that the prosecution was *not* for having private Bible study, but for Pastor Salman's attempts to operate a church out of his residence and attached structures. The state's expert classified the activities of Pastor Salman as "worship" and not just "bible study," while acknowledging that the line between the two can be fuzzy. (*Id.*, Ex. 21 at 236:3-237:3.) In his closing statement, the City prosecutor likewise contrasted Pastor Salman's activities with private

religious worship or Bible studies.[4] He noted that, unlike the study groups that Plaintiffs seek to hold, the property on which Pastor Salman was holding his meetings was conveyed to his church, the Harvest Christian Fellowship Church. (*Id.*, Ex. 23 at 2:15-3:24; *id.*, Ex. 16.) The property enjoyed tax-exempt status as a result. (*Id.*, Ex. 23 at 2:15-3:24.) Moreover, the photographic evidence reveals a set-up clearly intended for more than the bi-weekly study group. (*Id.*, Ex. 18.) Pastor Salman also dedicated the building as a church. (*Id.*, Ex. 29 at 74-77.)

While the thrust of their Complaint is that Plaintiffs seek to conduct Bible study and private worship at their homes, Sanchez testified at the hearing that he and Salman seek to hold conduct activities in their home that are similar to those performed by Pastor Salman. Even if Plaintiffs seek to perform religious activities above and beyond the Bible studies, they have not shown that the action against Pastor Salman creates a reasonable likelihood of enforcement of the building code against them. Pastor Salman's operation was more extensive in magnitude. As the evidence presented at the hearing demonstrated, the prosecution was not for having religious worship at the home; instead, the City found that Pastor Salman had built a separate structure, outfitted it as a chapel, ran a church out of the building, and invited the public to attend, but did not comply with City building code requirements for a place of assembly. Plaintiffs cannot have a reasonable fear of prosecution based on the actions of the City against Pastor Salman. This case is not ripe.

---

[4] "For each type of use in the City, any kind of use of a building or structure, there are requirements that must be met. Now if [address] is used solely as a single family residence it doesn't need to meet the requirements of an assembly use. However, if you go to the Building Code, Chapter 9, which discusses changes of occupancy, if all or any part of the property is used for an assembly use, it's got to comply with the Code requirements for that use. And there are some issues here. There are issues of safety, safe access, safe use when people assemble. It's called an assembly use because people get together, and when people get together there are certain protections that cities require, like fire sprinklers, like the right kind of access, the right kind of hardware on the doors. So if Pastor Salman is operating a place of worship, which is an assembly use, he's got to . . . meet assembly standards. And it's clear from the testimony and from the evidence that the attached garage, and the game room, were all changed from a U, which is the lowest hazard, a residential storage use, to an assembly use." (Jan. 11, 2013 Evid. Hr'g Ex. 23 at 1:21-2:14.)

**CONCLUSION**

Plaintiffs have failed to demonstrate a live case or controversy between themselves and the City. "Simply put, at this stage the dispute is purely hypothetical." *Thomas*, 220 F.3d at 1137. The resolution of the important constitutional and statutory questions presented by Plaintiffs is premature. Dismissal of the action is required. The evidence presented at the hearing revealed that amending the complaint would do little to cure the ripeness issue. Therefore, the dismissal will be with prejudice.

**IT IS THEREFORE ORDERED** that the City's Motion to Dismiss (Doc. 18) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 2) is **DENIED**.

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment in favor of Defendant City of Phoenix and against Plaintiffs. Plaintiffs shall take nothing and the complaint and this action are dismissed with prejudice.

Dated this 25th day of January, 2013.

*/s/ A. Murray Snow*
G. Murray Snow
United States District Judge